```
                                                    ┌─────────────────────────────────┐
                                                    │ USDC SDNY                       │
                                                    │ DOCUMENT                        │
UNITED STATES DISTRICT COURT                        │ ELECTRONICALLY FILED            │
SOUTHERN DISTRICT OF NEW YORK                       │ DOC #:_____         │
                                                    │ DATE FILED:__5/8/2015___         │
                                                    └─────────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
                                   :

*In re* LIGHTINTHEBOX HOLDING CO., LTD,  :            13-CV-6016 (VEC)
SECURITIES LITIGATION.               :
                                   :              ORDER

-----------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

This action arises out of the June 6, 2013, initial public offering ("IPO") of defendant

LightInTheBox Holding Co., Ltd. ("LITB"), an online retail company organized under the laws

of the Cayman Islands and headquartered in Beijing, China.  Amended Consolidated Class

Action Complaint ("Compl.") ¶ 10.  On August 19, 2013, LITB announced quarterly financial

results that were slightly below market expectations and lowered its forecasted third-quarter

revenues.  *Id.* ¶¶ 2-3.  The share price dropped and, as night follows day, a week later securities

fraud class action complaints were filed.  Three separate actions were consolidated on November

21, 2013, and Youhua Zheng ("Lead Plaintiff") was appointed to represent the class of investors

who purchased LITB shares between June 6, 2013 (the date of the IPO) and August 19, 2013

(the date of the announcement), inclusive.  Dkt. 33.

The Second Consolidated Amended Complaint (the "Complaint") alleged that LITB's

registration statement and prospectus "materially overstated [LITB's] prospects and growth

potential and materially misled the investing public by issuing false and misleading statements

and omitting material facts necessary to make Defendants' statements not false and misleading."

Compl. ¶ 5.  Lead Plaintiff's expert estimates that the aggregate damages to the class were

approximately $32 million.  Pl. Mem. at 25-26.

After Defendants had moved to dismiss the Complaint but before Lead Plaintiff had responded to the motion, the parties agreed to mediation.  After a day-long mediation, the parties accepted the mediator's double-blind proposal to settle all claims for a one-time cash payment of $1.55 million.  On November 26, 2014, the Court granted Lead Plaintiff's motion for preliminary approval of the settlement and plan of allocation (the "Settlement Agreement," Dkt. 71 Ex. A) and to provide notice to class members pursuant to Federal Rule of Civil Procedure 23(e).  Dkt. 79.  Notice was provided to the class consistent with the Court's preliminary approval order, and no objections were filed.  Lead Plaintiff moved for final approval of the Settlement Agreement, Dkt. 84, and Lead Plaintiff's Counsel, the Rosen Law Firm, P.A., ("Rosen" or "the Rosen Firm"), moved for an attorneys' fee award of one-third of the settlement amount ($516,666.67), reimbursement of $21,313.10 in litigation-related expenses, and an award of $2,000 to Lead Plaintiff, Dkt. 86; Dkt. 87 at 9-10.

On March 25, 2015, the Court held a hearing to consider approval of the Settlement Agreement.  Pursuant to that hearing and additional materials submitted by Lead Plaintiff, it is hereby ORDERED:

The motion to certify the proposed class (the "Class") [1]  pursuant to Federal Rule of Civil Procedure 23(b)(3) is GRANTED.  The Class satisfies the numerosity, commonality, typicality, and adequacy requirements of Federal Rule of Civil Procedure 23(a); common questions of law or fact predominate over any questions affecting only individual members; and class resolution is superior to other available methods for the fair and efficient adjudication of the controversy.

---

[1]      The proposed class consists of "all persons ('Settlement Class Members') who purchased or otherwise acquired American Depository Shares ('ADSs') of LITB between June 6, 2013, and August 19, 2013, inclusive of those dates, excluding (i) persons who timely and validly request exclusion from the settlement class . . . ; and (ii) Defendants and any entity in which Defendants have a controlling interest, as well as the officers, directors, affiliates, legal representatives, immediate family members, heirs, successors, subsidiaries and/or assigns of any Defendant in their capacity as such."  Dkt. 79 ¶ 2.

The motion for final approval of the Settlement Agreement is GRANTED, subject to the modification stipulated by Lead Plaintiff that settlement funds that remain unclaimed 180 days after a claimant's check has been issued will be redistributed to the class or, if the amount is too small to be redistributed in a cost-effective manner, donated to the New York City Bar Justice Center.  Pl. Supp. Mem. at 16 (Dkt. 94).

The Rosen Firm's request for attorneys' fees and expenses is GRANTED in part.  For the reasons stated below, Rosen shall be awarded 17.5% of the settlement fund in attorneys' fees.

Lead Plaintiff's requests for $21,313.10 in expenses is GRANTED; an award to Lead Plaintiff of $2,000 as compensation for time spent litigating this action is DENIED.

## THE SETTLEMENT AGREEMENT

The Court "may approve a class action settlement if it is fair, adequate, and reasonable, and not a product of collusion."  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (internal quotations omitted).  "Fairness" is both procedural and substantive.  *See id.* The Court should ensure procedural fairness based on "the settlement's terms and the negotiation process leading to settlement."  *Id.*  A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery."  *Id.* (citation omitted).  Although there was no "meaningful discovery" in this case, there is a "strong judicial policy in favor of settlements, particularly in the class action context."  *Id.*  The Court finds that the Settlement Agreement was procedurally fair because it was reached after an arms-length mediation, and the settlement amount was proposed by a neutral mediator.

Courts in the Second Circuit evaluate substantive fairness according to the "*Grinnell* factors."  *Id.* at 117; *see City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 454 (2d Cir. 1974).  Those factors are:

3

(1) the complexity, expense and likely duration of the litigation;

(2) the reaction of the class to the settlement;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;

(5) the risks of establishing damages;

(6) the risks of maintaining the class action through the trial;

(7) the ability of the defendants to withstand a greater judgment;

(8) the range of reasonableness of the settlement fund in light of the best possible recovery;

(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

*Wal-Mart Stores, Inc.*, 396 F.3d at 117 (citing *Grinnell*, 495 F.2d at 463).  The *Grinnell* factors

favor approval of the Settlement Agreement.  The pertinent players are located in the People's

Republic of China, which poses obstacles both to litigating the class action and to collecting any

judgment.  Although the amount of the settlement is small compared to Lead Plaintiff's estimate

of the total damages suffered by class members, the theory of liability alleged in the complaint

would be difficult to prove – which Defendants' motion to dismiss demonstrated – and no class

member objected to the settlement.  Moreover, the reality is that the settlement was driven by the

amount of insurance available to satisfy the judgment.  Settlement during the early stages of the

proceedings, when minimal amounts had been spent litigating the action, means that more of the

insurance funds are available to pay the settling class members.  In light of these considerations,

the Court finds that the Settlement Agreement is both procedurally and substantively fair.

## ATTORNEYS' FEE AWARD

The Court is permitted to award reasonable attorneys' fees in certified class actions.  Fed.

R. Civ. P. 26(h).  The determination of what is reasonable rests in the sound discretion of the

4

Court, acting as a fiduciary for the class.  *Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43, 47, 52 (2d Cir. 2000).  The fee applicant bears the burden of establishing the reasonableness of the fees sought.  *Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1160 (2d Cir. 1994).

The proposed order Lead Plaintiff's Counsel originally submitted with the motion for preliminary approval included a "clear sailing" provision stating that Defendants would not take any position regarding requested attorneys' fees.  *See* Dkt. 71-1 ¶ 26.  Although the Court struck that provision, defense counsel nonetheless took no position on the reasonableness of various deductions from the common fund, *see* Dkt. 79 ¶ 28, including the Rosen Firm's request for 33% of the settlement fund in attorneys' fees.  Defense counsel's lack of objection, "clear sailing" provisions or no, is understandable – defendants have no incentive to oppose a fee application once the amount of the settlement fund is agreed upon.  Although understandable, it leaves the Court in the position of having to review a fee application that is made by the class's representative that reduces the class's recovery without the benefit of the adversarial system.  *See Goldberger*, 209 F.3d at 52.  The risks in such a scenario are illustrated in this case: Lead Plaintiff's Counsel requested a percent of fund award that is at the highest end of the continuum of acceptable percentages for attorneys' fees, requested an award be granted to Lead Plaintiff without providing any of the factual support that is legally required, and included in its lodestar calculations hours expended by a law firm that was never disclosed to the class that it supposedly represented.

When fixing a reasonable legal fee, the Court "is to act as a fiduciary who must serve as a guardian of the rights of absent class members" because "the adversary system is typically diluted – indeed, suspended – during fee proceedings."  *Goldberger,.* 209 F.3d at 52.  "The party seeking fees bears the burden of establishing the reasonableness of the fee award requested,

including the number of hours for which compensation is sought." *Indymac Mortgage-Backed Sec. Litig.*, 09-CV-4583 (LAK), 2015 WL 1315147, at \*1 (S.D.N.Y. Mar. 24, 2015) (citing *Cruz*, 34 F.3d at 1160).

In a common fund settlement, courts in this circuit apply the "*Goldberger* factors" to evaluate the reasonableness of attorney fee awards. *See Wal-Mart Stores, Inc.*, 396 F.3d at 121-22 (citing *Goldberger*, 209 F.3d at 50). Those factors include: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation . . . ; (4) the quality of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." *Id.* (citing *Goldberger*). The Court may award attorneys' fees under the "lodestar" method or the "percentage of fund" method. *Id.* at 121. The lodestar method "multiplies hours reasonably expended against a reasonable hourly rate. Courts in their discretion may increase the lodestar by applying a multiplier based on factors such as the riskiness of the litigation and the quality of the attorneys." *Id.* The percentage of fund method is what its name implies: an award based on a percentage of the total settlement fund. *See id.* The lodestar is often used as a "'cross check' on the reasonableness of the requested percentage" if the latter method is chosen. *Goldberger*, 209 F.3d at 50.

The Rosen Firm asserted that its lodestar was $401,329 and that 33% of the fund represents a 1.3 lodestar cross-check multiplier. Pl. Mem. at 8-9. Although only the Rosen Firm had been appointed as counsel for the putative class, Rosen's submission relative to the lodestar consisted of $291,087.50 in "hourly fees" for the Rosen Firm and $110,241.50 in "hourly fees" for the firm Wolf Haldenstein Adler Freeman & Herz LLP. Stern Decl. ¶ 80 (Dkt. 88). Of the 682.2 hours purportedly spent litigating this matter on behalf of the plaintiffs, Wolf Haldenstein accounted for 210.9 hours. *Id.*

6

Responding to the Court's inquiries, the Rosen Firm represented that it had enlisted Wolf Haldenstein's aid in January 2014 to assist with drafting an amended complaint that purportedly shored up weaknesses in the consolidated class action complaint because the theory of liability was "novel." When the Rosen Firm moved to be appointed Lead Plaintiff's Counsel in October 2013, however, there was no request for co-lead plaintiff's counsel to be appointed nor was there any indication that the Rosen Firm would be unable to handle the litigation of this matter on its own. *See* Dkt. 33; 15 U.S.C. § 78u-4(a)(3)(B)(v) (lead plaintiff may select counsel to represent the class subject to court approval). It was not until *after* the fairness hearing that the Rosen Firm disclosed that the two firms actually had an "informal oral agreement that Wolf Haldenstein would work approximately 30% of the hours, receive 30% of any fee recovered, and advance 30% of any expenses that arose." Pl. Supp. Mem. at 15.

Although the Notice stated that "Plaintiffs' Counsel will ask the Court to approve payment from the Settlement Fund of attorneys' fees of one-third of the Settlement Fund," it did not disclose that Wolf Haldenstein was representing the class members in addition to the Rosen Firm and would be seeking a portion of the attorneys' fee award. *See* Long Form Notice, Dkt. 78 Ex. A-1 at A1-6, A1-11. The Private Securities Litigation Reform Act ("PSLRA") requires that if any "counsel intend[s] to apply to the court for an award of attorneys' fees or costs from any fund established as part of the settlement," the notice of the proposed settlement to class members must include "a statement indicating which parties or counsel intend to make such an application, [and] the amount of fees and costs that will be sought." 15 U.S.C. § 78u-4(a)(7)(C). Given the number of PSLRA actions that the Rosen Firm has litigated as Lead Plaintiff's Counsel, *see* Rosen Decl. Ex. A at 10-19 (Dkt. 88-2), the failure to disclose to class members that a second firm also "represented" the class and would seek fees out of the class members' settlement is inexplicable. The Court therefore disregards Wolf Haldenstein's contribution to the

7

lodestar (which the Rosen Firm invited the Court to do during the fairness hearing), which results in a cross-check multiplier of 1.77 if the Court were to grant the requested percentage of fund award.

Rosen argues that a 33% award with a 1.77 multiplier is reasonable because judges in this district have awarded one-third of settlement funds in securities class actions with similar (or higher) multipliers. Pl. Supp. Mem. at 13-14. That argument is flawed for several reasons. First, *Goldberger* explicitly rejected the idea that a "benchmark" attorney fee percentage should be used across cases. 209 F.3d at 51-53; *see also id.* at 52 ("[A] theoretical construct as flexible as a 'benchmark' seems to offer an all too tempting substitute for the searching assessment that should properly be performed in each case."). Instead, each "fee award should be assessed based on scrutiny of the unique circumstances of each case, and 'a jealous regard to the rights of those who are interested in the fund.'" *Id.* at 53 (citation omitted). Second, the fee awarded in every common fund action is "committed to the sound discretion of the district court" that is "intimately familiar with the nuances of the case." *Id.* at 47-48 (citation omitted). The fact that 33% fees or high lodestar multipliers were reasonable awards to other law firms that litigated different actions based upon different facts is of little persuasive value, particularly where none of the fee requests had the benefit of adversarial testing. *Accord In re Indymac*, 2015 WL 1315147, at *3. Moreover, as Rosen well knows, while cases have been approved with high lodestars and high percent-of-fund award, many other cases have awarded lower percent-of-fund awards with lower multipliers. *See, e.g.*, *In re Indymac*, 2015 WL 1315147, at *6 (granting an 8.2% fee award); *Munoz v. China Expert Technology*, 07-CV-10531 (AKH) (S.D.N.Y. Feb. 20, 2014) (awarding the Rosen Firm 25% of the settlement fund, representing a .46 lodestar multiplier); *accord Goldberger*, 209 F.3d at 52 (affirming the district court's award of 4% of the settlement fund; the court noted empirical analyses of securities class actions that have settled for

amounts between $50 and $75 million awarded revealed fee awards in the range of 11% to 20%).

Third, the Court is skeptical that a reasonable paying client would pay the proposed lodestar in

this case, let alone a 1.77 multiplier of that amount.  The Court cannot know what hourly rate the

Rosen Firm would fetch in an efficient market for plaintiff-side securities class action legal work

because the firm's hourly billing rates are untested by a competitive market.  *Goldberger*, 209

F.3d at 52.[2]  As a result, counsel are left to self-appraise the value of their time – time that is not

subjected to a paying client's scrutiny.

Under the circumstances of this case, without impugning the integrity of any of the

attorneys who were involved in this case, an attorneys' fees award of 33% of the settlement fund

is just not reasonable.  Applying the *Goldberger* factors:

(1)  **Time and labor expended by counsel**.  Although it is difficult to know whether the

hourly rates of the Rosen Firm would stand up in the market, the Court can reasonably assess the

number of hours purportedly spent on different tasks in connection with this matter based on

many years of legal experience as both outside and in-house counsel.  According to the fee

application, Rosen spent approximately 470 hours litigating an action in which the motion for

final approval of the settlement agreement was filed 12 months after the first complaint.  After

three separate actions were consolidated and Lead Plaintiff was appointed to represent the class,

the Rosen Firm filed two consolidated class action complaints.[3]  Lead Plaintiff was successful in

---

[2]     The Rosen Firm cited to other matters in which it was awarded fees as lead plaintiff's counsel using hourly
rates comparable to those submitted here in the lodestar crosscheck.  Pl. Supp. Mem. at 12.  In each case, however,
the Court based its approval of the fees solely on the firm's own submissions.  Rosen "billed" $775 per hour for
himself in this matter, compared to $750 in three other cited matters; $625 per hour for Phillip Kim, a partner,
compared to $575 to $625 per hour in other matters; and between $400 and $550 per hour for the four associates
who worked on the case, compared to the same associates "billing" at $350 to $530 per hour in other matters.

[3]     The Rosen Firm purportedly spent 84.4 hours drafting the first consolidated amended complaint.  Pl. Supp.
Mem. at 6.  When Defendants requested leave to move to dismiss the consolidated complaint, Rosen spent an
additional 17.6 hours responding the Defendants' request and then 24.8 hours drafting a second amended
consolidated complaint.  *Id.* at 6-8.  Thus, over 100 hours were purportedly spent by the Rosen Firm alone drafting
the Complaint.  That time does not include the hours contributed by the Wolf Haldenstein firm, whose assistance

her motion to be appointed lead plaintiff (and for the Rosen Firm to be designated Lead

Plaintiff's Counsel),[4] although how that particular motion benefitted the class (as opposed to

benefiting only the Lead Plaintiff and the Rosen Firm) is unclear.  The parties settled before the

Rosen Firm had to respond to Defendants' motion to dismiss and before discovery commenced.

Although the Court credits the Rosen Firm's representation that a response to the motion to

dismiss needed to be drafted to support the strength of the class's legal position in the

mediation,[5] given the Rosen Firm's experience in litigating securities class actions, almost 80

hours seems on the high side of what would be reasonable given the posture of the case

(particularly given the almost 100 hours that went into crafting the Amended Complaint).

Finally, the Rosen Firm represented that it spent almost 80 hours preparing settlement papers and

moving for preliminary approval of the settlement, an unreasonable number of hours given the

fact that the submissions were largely boilerplate and this sort of work is the bread and butter of

this firm.[6]   Overall, even excluding the hours of Wolf Haldenstein, the Court finds that the 470

hours the Rosen Firm purportedly spent on this case are excessive.

(2)  **Magnitude and complexities of the litigation**.  The Rosen Firm is an experienced

securities class action litigation law firm.  Rosen argues that this case presented novel legal

issues; the purportedly "novel" aspect of this case was that plaintiffs were relying on a difficult-

---

was purportedly particularly helpful in crafting the second consolidated amended complaint.  *See* Guiney Decl. ¶ 2
(Dkt. 88-3).  The Court finds that to be an excessive number of hours for the complaint in this case.

[4]      The Rosen Firm purportedly spent 27.8 hours on this motion – an unreasonable amount of time to spend on
what is essentially a boilerplate motion for a firm that does this sort of work regularly.  *Id.* at 3-4.

[5]      The Rosen Firm purportedly spent 79.6 hours drafting its unfiled opposition to Defendants' Motion to
Dismiss the Second Amended Complaint.  *Id.* at 8.

[6]      The Firm reported that it spent 28.9 hours drafting settlement papers and 50.2 hours preparing the
memorandum in support of their motion for preliminary approval and the supplemental brief ordered by the Court.
Then, they spent an additional 35.2 hours moving for final approval of the settlement.  That means that almost 25%
of their lodestar is for hours worked *after* the settlement offer was accepted.

to-prove theory that alleged actionable misstatements or omissions of material fact solely based

on contemporaneous business trends that were inconsistent with Defendants' statements of

corporate optimism made during an IPO "road show."[7]  Although Rosen contends that this case

was particularly complex because defendants reside in countries where discovery is difficult –

and collecting a judgment may be nearly impossible – Rosen was aware of those issues when it

sought to be designated as Lead Plaintiff's Counsel.  Moreover, the class period was relatively

short, and the primary focus was on statements made during a recently-conducted IPO "road

show."  The regulatory filings were limited and primarily consisted of the IPO registration

statements and prospectus.  In short, as securities class actions go, this matter was on the routine

end of the continuum of complexity.

  (3)  **Risk of litigation**.  This is not a high-risk variety of common fund litigation.  "It is

common knowledge that almost all securities class actions are settled."  *In re Indymac*, 2015 WL

1315147, at *2; *accord Goldberger*, 209 F.3d at 52 (recognizing that there is almost no

appreciable risk of non-recovery because "virtually all" securities class actions are settled).  The

primary risk in this particular litigation was that a judgment that exceeded Defendants' liability

insurance would not be collectible because Defendants are located in China and Chinese courts

will not enforce United States civil judgments.  The Court concurs that the Rosen Firm's strategy

of striking an early settlement was in the best interest of the class as it avoided depleting the

amount of insurance available to pay a settlement.  The Court further finds that the $1.55 million

settlement was reasonable in light of the $5 million of available insurance proceeds.  As far as

the risk that the Rosen Firm undertook in representing Lead Plaintiff on a contingency, however,

---

[7]  Casual research revealed that this theory was not particularly novel.  *See*, *e.g*., *Panther Partners Inc. v. Ikanos Communications, Inc.*, 681 F.3d 114 (2d Cir. 2012); *Litwin v. Blackstone Group, L.P.*, 634 F.3d 706 (2d Cir. 2011).

LightInTheBox's insurance policy virtually guaranteed payment so long as the Rosen Firm
settled the action before defense costs depleted the policy limits.

(4)  **The quality of representation**.  Overall, the Court is satisfied that the Rosen Firm
litigated this case effectively.  The Court accepts that settling early to avoid the costs of
discovery was a prudent decision that benefitted the Class.  On the other hand, Rosen sought an
award fee for the Lead Plaintiff without complying with the statutory requirements to seek such a
fee, failed to disclose the existence of co-counsel as is statutorily required, and failed to include
in its initial Proposed Order any provision for disposition of unclaimed settlement funds.

(5)  **The requested fee in relation to the settlement**.  Removing Wolf Haldenstein's
fees from the equation, a 1.77 multiplier of the Rosen Firm's lodestar fees (which assumes the
rate per hour and the number of hours were reasonable) is simply unreasonable.  The justification
for a multiplier above the lodestar cross-check in a common fund case is to compensate for
contingency risk assumed and to ensure quality representation in common fund cases.  *See
Goldberger*, 209 F.3d at 53-54.  Those factors, however, "do not always compel enhanced fees."
*Id.* at 53.  Courts should approach fee awards "with an eye toward moderation," particularly in
cases like these where a settlement was virtually certain.  *Id.* at 53; *see also McDaniel v. Cnty. of
Schenectady*, 595 F.3d 411, 419 (2d Cir. 2010) (citing *Goldberger*, 209 F.3d at 52).  A 17.5%
attorneys' fee award represents a 0.90 lodestar multiplier, which is much more reasonable
compensation given what the Court finds to be excessive hours spent on routine tasks.
Moreover, assuming every hour worked was efficiently and effectively spent (a questionable
assumption), a 17.5% percentage of award fee yields a blended hourly rate of approximately
$575**,** which is imminently reasonable, if not generous.

(6)  **Public policy considerations**.  Public policy does not justify a 33% attorneys' fee
award in this case.  The public interest is served by compensating plaintiffs' attorneys well in

order to attract high caliber representation and to ensure shareholders' interests are preserved in

private securities class actions.  It is not necessary, however, to grant a fee award substantially

greater than the lodestar to serve that interest, particularly when, as explained above, settlement

is virtually guaranteed and the lodestar is suspect because it is calculated based on rates and

hours that are not subject to serious client scrutiny.  There is no dearth of plaintiffs' firms willing

to litigate securities class actions.  Public policy is better served by ensuring that class members

receive an adequate portion of the settlement fund.

In light of all of these considerations, the Court finds that a 17.5% fee award of $271,250

and a lodestar multiplier of .93 is reasonable.

### COSTS AND AWARD TO LEAD PLAINTIFF

The Court finds that the Rosen Firm's request for $21,313.10 in litigation costs and

expenses incurred in connection with this action are reasonable and warranted.

The request for a $2,000 award to Lead Plaintiff merits further discussion.  Under

PLSRA, "[t]he share of any . . . settlement that is awarded to a [Lead Plaintiff] serving on behalf

of a class shall be equal, on a per share basis, to the portion of the final judgment or settlement

awarded to all other members of the class."  15 U.S.C. § 78u-4(a)(4).  A lead plaintiff's

compensation is limited to "reasonable costs and expenses (including lost wages) directly

relating to the representation of the class."  *Id.*  Lead Plaintiff's initial request provided *no*

documentation to establish that *any* award was justified, instead breezily claiming that "Lead

Plaintiff spent ample time reviewing the pleadings and conferring with counsel about case

strategies and the resolution of this matter."  Pl. Mem. at 10.[8]

---

[8]      As indicated below, it turns out that in the Rosen Firm's estimation, less than 20 hours is an "ample" amount of time.

Lead Plaintiff's supplemental memorandum claims that lead plaintiffs generally should receive an award to "provide an incentive . . . to remain involved in the litigation," and cites cases in this district that have granted "incentive awards" to lead plaintiffs. Pl. Supp. Mem. at 15. Lead Plaintiff allegedly spent 16.75 hours on this matter, broken down as follows: 3.75 hours "independently monitor[ing] information about LITB;" 3 hours obtaining trading information; 8 hours corresponding with the Rosen Law Firm; and 2 hours reviewing the initial complaint and two amended complaints. Pl. Supp. Mem. at 16. There was no documentation to support that the time spent amounted to "costs and expenses (including lost wages)," or what Lead Plaintiff's lost wages (if any) were. *Cf. In re Bank of America Corp. Sec., Derivative, and Emp. Ret. Income Sec. Act (ERISA) Litig.*, 772 F.3d 125, 133 (2d Cir. 2014) (affirming award of costs because plaintiffs "submitted affidavits to the district court that included a thorough accounting of hours dedicated to the litigation and a statement that these hours constituted lost work time – an item for which § 78u-4(a)(4) expressly allows recovery."). The requested award would compensate Lead Plaintiff almost $120 per hour, again assuming that the hours reported were reasonably spent on the tasks specified. Although $2000 is a modest fee, the Court declines to award it. The concept behind the PSLRA's requirement that the plaintiff with the largest stake in the litigation should normally be named "lead plaintiff" is that such a plaintiff has his, her or its own financial interest to protect and that self-interest will insure that such a plaintiff will remain engaged in the litigation. *See In re NYSE Specialists Sec. Litig.*, 240 F.R.D. 128, 132-33 (S.D.N.Y. 2007) ("[T]he PSLRA was intended to prevent 'lawyer-driven' litigation, and to ensure that parties with significant financial interests in the litigation will participate in the litigation and exercise control over the selection and actions of plaintiffs counsel." (internal quotations and citations omitted)). While there undoubtedly are securities fraud class action

matters where the lead plaintiff's role in the litigation is so substantial that, in fairness, he, she or

it should get an award for time and energy spent working on the litigation, this is not such a case.

## CONCLUSION

The Court certifies the proposed class and finds that the Settlement Agreement is fair,

adequate, and reasonable.  The Rosen Firm is awarded $21,313.10 in litigation costs and

$271,250 in fees.  Lead Plaintiff's request for a litigation "incentive" award is DENIED.

The Clerk of Court is requested to terminate Docket Entries 84 and 86 and enter final

judgment in this matter.


**SO ORDERED.**

**Date:  May 8, 2015**                                        **VALERIE CAPRONI**
**        New York, New York**                        **United States District Judge**